**First Lieutenant Michael J. TREMBLAY, United States Army, Petitioner, Appellant,**

v.

**John D. MARSH, Jr., Secretary of the Army, Respondent, Appellee.**

**No. 84–1338.**

United States Court of Appeals, First Circuit.

Argued Nov. 6, 1984.

Decided Dec. 14, 1984.

Mitchell Benjoya, Boston, Mass., with whom Denner & Benjoya, Boston, Mass., was on brief for petitioner, appellant.

William P. Joyce, Sp. Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., and Jeffrey R. Martin, Asst. U.S. Atty., Boston, Mass., were on brief for respondent, appellee.

Before COFFIN and BOWNES, Circuit Judges, and WYZANSKI,* Senior District Judge.

BOWNES, Circuit Judge.

Petitioner-appellant, Michael J. Tremblay, appeals the refusal of the district court to grant a preliminary injunction against defendant-appellee, Secretary of the Army, relieving Tremblay from reporting for 119 days of active military duty as ordered. The district court, 584 F.Supp. 224, granted Tremblay a stay pending decision of this appeal.

THE FACTS

Tremblay joined the United States Army Reserve Officer Training Corps in 1974 while an undergraduate at Northeastern University. Tremblay executed an enlistment contract on January 1, 1977, agreeing to serve for six years in the Army. Upon his graduation from Northeastern, Tremblay was commissioned a second lieutenant in the United States Army Reserves. After being accepted at the New England School of Law in the spring of 1979 for the class starting in September, 1979, Tremblay applied for and was granted an educational delay by the Army so that he could complete his legal studies.

During the summer following his first year at law school, Tremblay worked as a legal intern for the Judge Advocate General Corps (JAGC) at Fort Devens, Massachusetts. The next summer was spent as a JAGC intern in Mannheim, West Germany. When Tremblay was at Fort Devens, he learned of a bill pending in Congress which, *inter alia*, provided that the entry rank for a JAGC officer would be reduced from captain to first lieutenant and that the three-year service credit for the educational delay period spent in law school would be eliminated. This concerned Tremblay because he intended to apply for JAGC duty on his graduation from law school.

Tremblay learned in May, 1981, that the bill had been passed in November of 1980, the Defense Officer Personnel Management Act, Pub.L. No. 96–513. Tremblay wrote letters in May and June of 1981 to the JAGC Personnel Plans and Training Office and to Senators Paul Tsongas and Strom Thurmond and Representative Joseph Moakley. The letters were critical of the legislation and urged the enactment of an exemption from the reduction in rank and elimination of the service credit provi-

* Of the District of Massachusetts, sitting by designation.

sions for second lieutenants who had, like Tremblay, obtained an educational delay for attending law school prior to the passage of the bill.

Tremblay applied for assignment to the JAGC in October of 1981, but was not selected. He reapplied in January of 1982, and again was rejected by the selection board. Tremblay's letter to Senator Thurmond and the JAGC's response to an inquiry by the Senator was included with Tremblay's application materials and was available for review by the JAGC selection board.

Tremblay graduated from New England Law School with honors in June, 1982. In early April, 1983, Tremblay was ordered to report for active duty on January 13, 1983, for a Military Police Officer Basic Course and permanent assignment to an Army M.P. unit. Tremblay requested release from this active duty assignment in July of 1982; the request was granted in August, 1982. Tremblay twice tendered a resignation of his commission; neither tender was accepted. On April 6, 1983, Tremblay was ordered to report for 119 days of active duty at the United States Army Military Police School on June 1, 1983. The suit leading to the appeal was commenced on May 20, 1983. A temporary restraining order was issued pending a hearing on the preliminary injunction.

*The Issues*

Tremblay makes two claims as a basis for the relief sought: breach of contract; and retaliation for the exercise of his first amendment right of freedom of speech.

The breach of contract claim is contained in paragraph 6 of the complaint. It alleges:

6. At the time of Petitioner's enlistment it was represented to him by his ROTC instructors and the literature given to him that his aspiration to attend law school upon graduation from college would be sacrosanct, that he would practice law thereafter in the Army if he (1) attended an ABA accredited law school (2) graduated, and (3) passed a state bar examination, that he would enter the JAG Corps (Judge Advocate General) in the rank of Captain, and, finally, that any debts incurred by him during law school could be deferred until the termination of his service obligation.

The first amendment claim is that the Army refused to appoint him a JAGC officer because he had written letters to Congressmen criticizing the legislation which he felt was unfair to himself and others similarly situated.

The district court found that Tremblay had shown irreparable harm, a balance of hardship in his favor, and no adverse effect upon the public interest, but that he had failed to demonstrate a likelihood of success on the merits of either of his claims. The findings as to the first three factors have not been challenged and we accept them as given. The only question, therefore, is whether or not Tremblay has made a sufficient showing of likelihood of success on the merits.

We agree with the district court on the contract claim and adopt that portion of its opinion dealing with it. We add that petitioner has allowed his dashed expectations to distort his reading of the plain terms of his military contract and that he has adduced no facts except his own assertions, all effectively rebutted by the defendant's affidavits, to buttress his claim that representations were made to him that upon graduation from law school he would be appointed a JAGC officer.

The first amendment claim, however, is not so easily disposed of. The district court focused on the evidence brought out in the declaration of Major Rosenblatt, executed pursuant to 28 U.S.C. § 1746. Major Rosenblatt was a member of the JAGC and the recorder for the selection board which rejected Tremblay. Paragraph 3 of the declaration states:

3. In July 1981 this office was asked to coordinate on a proposed response to Senator Thurmond prepared by the Administrative Law Division of the Office of The Judge Advocate General. A copy of the response to Senator Thurmond as

well as Lieutenant Tremblay's letter that Senator Thurmond forwarded was included with his application materials and was available for review by the selection board. It is a routine practice to include Congressional correspondence in the application folders. A number of applicants write their Congressmen and Senators. This correspondence provides the board additional insight into an applicant's writing style and written expression. There is no negative inference drawn by the mere fact that an applicant corresponds with members of Congress. In paragraph 4, the declaration goes on to state that the Army advocated a view similar to that advocated by Tremblay in his letter to Senator Thurmond.

Paragraph 5 of the declaration explains that the selection rate for a commission in the JAGC decreased significantly. It states that at the time of Tremblay's first application, 113 out of 388 applicants (29%) were selected and at the time of his second application only 36 out of 377 applicants (9.5%) were chosen. The declaration further states that thirty ROTC officers, including some from Harvard and Columbia Law Schools, and six summer interns were rejected at the time Tremblay's first application was considered and that forty-five ROTC officers and four summer interns were not selected in April of 1982 when Tremblay's application was reconsidered.

Paragraph 6 of the declaration states that from 1976 to 1980 the selection rates for ROTC officers into the JAGC were much higher, ranging from 92.8% to a rate in excess of 95%. The final paragraph of the declaration states that Tremblay did not reapply for the JAGC after April, 1982, even though eligible to do so.

The district court did not specifically discuss or comment on the evidence which Tremblay adduced on this issue. Tremblay first pointed out that he had an excellent academic record at law school. His evidence included a certificate of achievement for his work as a legal intern for the Army at the Mannheim Law Center in the summer of 1981. The Army also awarded Tremblay the title of "Legal Eagle" for "the indelible mark he made on military justice in Mannheim Community." Tremblay filed a letter from his commanding officer at Mannheim recommending him for a commission in the JAGC. Tremblay's application for an appointment to the JAGC was endorsed by Captain Garrison, Deputy Chief, Criminal Law Division at the Mannheim Law Center. Captain Garrison stated, *inter alia*, "[a]ll who worked with him were extremely impressed with his knowledge of the law, his methods of case preparation, and his rapport with others. I would be happy to have Mike return to Mannheim as a member of the JAG Corps. I hope this application receives favorable consideration."

As part of his evidence, Tremblay filed three affidavits of 1982 law school graduates who were accepted by the JAGC. Geraldine Brotherton graduated from New England Law School in 1982. She was a member of the Law Review. She was not a JAGC summer intern, and had no military or ROTC experience. Brotherton applied for the JAGC during her final year at law school and was accepted. Mark P. Sposato also graduated from New England Law School in 1982. He did not work as a JAGC summer intern and had no military or ROTC experience. His application for the JAGC was accepted. Elaine Deedy-Sincali graduated from Suffolk Law School in 1982. Like the other two affiants, she had not worked as a JAGC intern and had no military or ROTC experience and received an appointment as an officer in the JAGC.

Were this case limited to weighing Tremblay's affidavits and other material against that of Major Rosenblatt's statistically based explanation of the selection of JAGC candidates, we would be constrained to find that Tremblay had not shown a likelihood of success on the merits. There is, however, the matter of Tremblay's letter to Senator Thurmond in the selection board application file. We do not agree with the district court that "there is absolutely no evidence linking petitioner's letter [to Sena-

tor Thurmond] with his failure to be selected for the JAGC."

Contrary to the district court, we find that the very presence of the letter in the application file raises an inference that it might have been a factor in the selection board's decision. Major Rosenblatt's explanation of the letter as providing "additional insight into an applicant's writing style and written expression" is not very convincing. One must wonder what kind of writing sample is used by the selection board for applicants who have not written a Congressman. Nor do we understand why it is "routine practice to include Congressional correspondence in the application folders." Surely, the selection board for JAGC applicants does not also have the responsibility of replying to congressional inquiries.

The inference of retaliation raised by the presence of the letter in Tremblay's JAGC application file is heightened by the Army's failure on three separate occasions to include it in the application folders sent to Tremblay. After Tremblay's first and second rejections, he received what purported to be his complete application files. Senator Thurmond's letter was in neither one. In December, 1982, Tremblay made a request for his complete application folder under the Freedom of Information Act. The file he received did not contain the Senator's letter. Not until Major Rosenblatt's declaration was filed in court did the Army reveal that Senator Thurmond's letter was among the materials available for consideration by the JAGC selection board. The letter itself, however, was not included in the submissions to the court.

Another item not included in the file sent to Tremblay or in the court submissions was the response to Senator Thurmond by Major Rosenblatt and the Administrative Law Division of the JAGC. This response as well as Tremblay's letter was included in his application folder. Although Major Rosenblatt's declaration does not specifically state that there was an inquiry by Senator Thurmond, we can only assume that the "response" was prompted by an inquiry of some sort. The nature of the inquiry would be revealed by the missing response.

The affidavits and submissions by Tremblay, the presence of Tremblay's letter to Senator Thurmond and the JAGC's response to the Senator's inquiry in the material available to the selection board, and the failure of the JAGC to submit the letter and the response to the court evince, in light of the undisputed findings as to irreparable harm, the balance of hardships and the lack of adverse effect on the public interest, a sufficiently substantial likelihood of success on the merits of the first amendment retaliation claim. *See, e.g., Roth v. Bank of the Commonwealth,* 583 F.2d 527, 536–38 (6th Cir.1978); *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1953); *generally,* C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 450–55 (1973).

*Affirmed in part, reversed in part.*

*Remanded.*

The defendant is restrained from ordering plaintiff to active duty pending a hearing on the merits of the first amendment claim.

Costs to appellant.